RAMBUS, INC., Plaintiff,

v.

INFINEON TECHNOLOGIES AG, Infineon Technologies North America Corp., and Infineon Technologies Holding North America, Inc., Defendants.

No. CIV.A.3:00CV524.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 9, 2001.

Michael W. Smith, Esquire, Craig T. Merritt, Esquire, Christian & Barton, L.L.P., Richmond, VA, David E. Monahan, Esquire, John Allcock, Esquire, Gray Cary Ware & Freidenrich LLP, San Diego, CA, for Plaintiff.

Brian C. Riopelle, Esquire, Robert M. Tyler, Esquire, McGuire Woods, LLP, Richmond, VA, John M. Desmarais, Esquire, Kirkland & Ellis, New York, NY, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

A jury found the Plaintiff and Counter-claim Defendant Rambus, Inc., ("Rambus"), liable on Count 10 (actual fraud) and Count 11 (constructive fraud) of the coun-

terclaims asserted by the Defendants and Counterclaim Plaintiffs Infineon Technologies AG, Infineon Technologies North America Corp. and Infineon Technologies Holding North America, Inc., (collectively "Infineon" hereinafter).

The jury awarded nominal and punitive damages on the actual fraud claim and nominal damages on the constructive fraud claim. Having preserved its options during the trial, Rambus now has moved for judgment as a matter of law ("JMOL") under Fed.R.Civ.P. 50, or, alternatively, for a new trial, under Fed.R.Civ.P. 59. Rambus contends that JMOL must be granted in its favor because: (1) Infineon failed to prove by clear and convincing evidence the elements of fraud under Virginia law; (2) nominal damages are not available in fraud actions under Virginia law, therefore the punitive damages awarded on the basis of the nominal damage award must be set aside; (3) the preponderance of the evidence demonstrates that Infineon's fraud claims are barred by the two year statute of limitations, *see* Va.Code § 8.01–243 and 249(1); and (4) the Court erred in refusing to give Rambus' proffered jury instruction pursuant to *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed.Cir.1988). In its motion for a new trial, Rambus again alleges that: (1) Infineon did not establish the requisite elements of fraud; (2) the preponderance of the evidence shows that the fraud claims are barred by the statute of limitations; and (3) the Court erred in refusing to give Rambus' proffered instruction pursuant to *Kingsdown Medical.*

## I. STATEMENT OF PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

Rambus filed a complaint on August 8, 2000, alleging that Infineon had infringed two of its patents. On October 20, 2000, Rambus filed a First Amended Complaint which added charges of infringement of two additional patents. On January 10, 2001, Infineon filed counterclaims alleging that: (1) it was entitled to a declaratory judgment that the four patents-in-suit were not infringed, were invalid and were unenforceable (Counts 1–4); (2) Rambus breached its contract with JEDEC,[1] a technology standards-setting body (Count 8); (3) Infineon was entitled to damages as a third-party beneficiary of that breached contract (Count 9); (4) Rambus committed actual fraud while a member of JEDEC (Count 10); (5) Rambus committed constructive fraud while a member of JEDEC (Count 11); (6) Rambus obtained monopoly power in the relevant technology market in violation of the Sherman Act, 15 U.S.C. § 2 (Count 12); (7) Rambus had attempted to obtain a monopoly in the relevant technology market in violation of the Sherman Act, 15 U.S.C. § 2 (Count 13); and (8) Rambus violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* through its fraudulent conduct at JEDEC (Count 14).

An opinion was issued pursuant to *Markman v. Westview Instrs. Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) to construe the disputed claim terms of the patents. Thereafter, Rambus abandoned, before trial, the charge of infringement as to one of the patents-in-suit, U.S. Patent No. 5,954,804. After the presentation of Rambus' infringement case, the Court granted JMOL in Infineon's favor on the remaining three patents-in-suit, U.S. Patent Nos. 5,953,263; 6,032,214; and 6,034,-918. Infineon then agreed that its request

---

**1.** "JEDEC" is the acronym for the Joint Electronics Devices Engineering Counsel. Its parent organization is the Electronic Industry Association.

for a declaratory judgment on the validity and enforceability of the patents-in-suit and its claim for monopolization were mooted by the infringement ruling (Counts 1–4 and 12). At the close of Infineon's case-in-chief on its counterclaims, the Court granted JMOL in favor of Rambus on the breach of contract claims (Counts 8 and 9) and the attempted monopolization claim (Count 13).

At the conclusion of the two and one-half week trial, in a special verdict form, the jury found Rambus liable for committing actual and constructive fraud (Counts 10 and 11) in its conduct at JEDEC respecting both the Synchronous Dynamic Random Access Memory ("SDRAM") and the Double Data Rate SDRAM ("DDR SDRAM") standards adopted by JEDEC. The jury awarded nominal damages in the amount of $1.00 on each of the fraud claims and punitive damages in the amount of $3,500,000.00 on the actual fraud claim. Pursuant to Va.Code § 8.01–38.1, the Court reduced the amount of punitive damages to $350,000.00. The jury found in favor of Rambus on the RICO claim (Count 14).

### B. Factual Background

Rambus is a technology company that designs and licenses computer memory systems. Rambus does not manufacture memory devices, but instead licenses its technologies to semiconductor manufacturers. The existence and the profitability of Rambus depends entirely on securing patents and licensing them to manufacturers.

In April 1990, Rambus filed a patent application covering a new design for computer memory systems. The United States Patent and Trademark Office ("PTO") determined that this application, U.S. Patent App. No. 07/510,898 ("the '898 application"), contained 11 independent and distinct inventions. The PTO, there-fore, required Rambus to select only one of those inventions to pursue in the '898 application and allowed it to file divisional applications on the remaining inventions. Rambus did precisely that.

As of the date of trial, Rambus had been granted 31 patents based on the 1990 '898 application and numerous applications are currently pending. Many of these early patents are directed to "Rambus DRAMs" or "RDRAMs," which is a predecessor to the SDRAM technology. Rambus has licensed several semiconductor manufacturers, including Infineon, for the RDRAM technology.

The four patents-in-suit, however, are addressed to SDRAMs and DDR SDRAMs. In a SDRAM, the central processing unit, or CPU, sends and receives information from the memory device according to the "tick" of a "clock" contained within the memory system. In DDR SDRAMs, the rate of the transfer of information is doubled because information is sent on both the "tick" and the "tock" of the clock.

Infineon makes and sells a variety of semiconductor devices to be used in computers, including SDRAMs and DDR SDRAMs. Infineon's fraud claim focused on Rambus' conduct while Rambus and Infineon were members of JEDEC, an association of semiconductor manufacturers and designers who collaborate to develop industry-wide technical standards for semiconductor products in order to ensure that Dynamic Random Access Memory ("DRAM") products, made by different manufacturers, are compatible with one another. As part of its standardization process, JEDEC sought to avoid incorporating patented technology into its standards. To that end, JEDEC policy required members to disclose patents and patent applications that related to JE-DEC's standard-setting work. If JEDEC

decided to include a patented technology in a standard, its members who held patents on that technology were required (by agreement) to license that technology "under reasonable terms and conditions that are demonstrably free of any unfair discrimination."

A central issue in dispute at trial was whether, before 1993, JEDEC members had a duty to disclose *pending* patent applications (and not just patents that had been issued). In 1993, JEDEC Manual of Organization and Procedure JEP 21–1 was amended to state:

> The Chairperson of any JEDEC committee, subcommittee, or working group must call to the attention of all those present the requirements contained in EIA Legal Guides, and call attention to the obligation of all participants to inform the meeting of any knowledge they may have of any *patents, or pending patents*, that might be involved in the work they are undertaking.

(emphasis added). *See also id.* ("Standards that call for use of a patented item or process may not be considered by a JEDEC committee unless all of the relevant technical information covered by the patent or *pending patent* is known to the committee . . ."). Notwithstanding that the JEDEC manual did not explicitly provide, until 1993, that pending patents were to be disclosed, Infineon presented clear and convincing evidence at trial, through JEDEC members and representatives, that, at all times at issue before 1993, the duty to disclose applied to pending applications.

JEDEC standard-setting activity was accomplished largely by committees and JEDEC Committee JC–42.3 was in charge of developing a standard for the SDRAM technology. Consideration of the SDRAM standard began in 1991 and a standard was eventually adopted in 1993. Various modifications were made to that standard from 1993 until 1995 and beyond. DDR SDRAM is the successor technology to the SDRAM technology. Committee JC–42.3 began work on the DDR SDRAM standard officially in 1996, although Infineon presented evidence showing that various technological concepts, which ultimately were included in the DDR SDRAM JEDEC standard, were discussed at Committee JC–42.3 meetings as early as 1992 and continuing thereafter throughout the time that Rambus was a member of JEDEC. The DDR SDRAM standard was published in 2000.

Rambus attended its first JEDEC meeting in December 1991 and joined the organization a few days later. Rambus representatives Richard Crisp and Billy Garrett regularly attended Committee JC–42.3 meetings until December 1996. By letter dated June 17, 1996, Rambus formally withdrew from JEDEC. In the time that Rambus was a member of JEDEC, it never disclosed any patent applications. It did, however, disclose its first patent to be issued, U.S. Patent No. 5,243,703 ("the '703 patent"), which issued on September 7, 1993. When Rambus withdrew from JEDEC, one stated reason was that its licensing business plan may not be consistent with the patent policies of standards-setting bodies like JEDEC.

The applications for the four patent-in-suit were submitted between 1997 and 1999 and issued in 1999 and 2000. However, the evidence showed that the four patents-in-suit are divisional or continuation applications of other Rambus patents which were pending during the time that Rambus was a member of JEDEC and at a time when Rambus had a duty to disclose its pending patents. Infineon offered extensive evidence which convinced the jury that Rambus committed fraud by: attending JEDEC meetings, listening to

the proposed technology to be included in the JEDEC standard, remaining silent (in the face of a duty to disclose) about its pending patent applications during those meetings, and, with the assistance of its patent lawyers, obtaining additional patents to cover the features of the JEDEC SDRAM standard, even as those features were being considered at Committee JC–42.3 meetings.

The foregoing recitation of the proof at trial provides a foundation for assessment of Rambus' post-trial motions, although additional evidence relevant to the disposition of the motions will be discussed in greater detail as it relates to each particular basis for the challenges made by Rambus to the jury's verdict.

## II. DISCUSSION: JUDGMENT AS A MATTER OF LAW

### A. Applicable Standard: Motion for Judgment as a Matter of Law

■ Under Rule 50(b) of the Federal Rules of Civil Procedure, if a party has requested and been denied JMOL during trial, "[t]he movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59." A district court may grant a motion under Rule 50(b) if it determines, "without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir.1999), *cert. denied* 528 U.S. 877, 120 S.Ct. 184, 145 L.Ed.2d 155 (1999). *See also Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985) ("The test for determining whether [JMOL] should be entered is whether, viewing the evidence in the light most favorable to the appellee-plaintiff, there is substantial evidence in

the record to support the jury's findings."), *cert. denied* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986). Furthermore, "[t]he movant is entitled to judgment as a matter of law if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir.1995) (internal citations omitted).

■ "Judgment as a matter of law is proper only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *Scheduled Airlines Traffic Offices, Inc. v. Objective, Inc.*, 180 F.3d 583, 588 (4th Cir.1999). The evidence must be viewed in the light most favorable to the non-moving party and every legitimate inference must be drawn in that party's favor. *See Tools USA and Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 657 (4th Cir.1996). "The district court also 'must view the evidence presented through the prism of the substantive evidentiary burden.'" *Byelick v. Vivadelli*, 79 F.Supp.2d 610, 616 (E.D.Va. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (in the context of motion for summary judgment).

### B. The Constructive Fraud Verdict

■ Infineon argued, and the jury found, that Rambus committed constructive fraud while it was a member of JEDEC by failing to disclose its patents and pending patent applications which related to the standard-setting work underway at JEDEC, in spite of a duty to disclose those patents and patent applications. To prevail on a claim of constructive fraud, a plaintiff must prove:

that a false representation of material fact was made, innocently or negligently,

and that the injured party suffered damage as a result of his reliance on the misrepresentation. In addition, the evidence must show that the false representation was made so as to induce a reasonable person to believe it, with the intent that a person would act on this representation.

*Henderson v. Henderson,* 255 Va. 122, 495 S.E.2d 496, 499 (1998) (citations omitted). Rambus has challenged the finding of constructive fraud on numerous evidentiary grounds and requests a grant of JMOL in its favor. Although the finding of liability on the constructive fraud claim must be set aside, that conclusion is reached purely as a matter of Virginia law, not on an asserted failure of the evidence.

Earlier in these proceedings, when considering Rambus' motion to dismiss Infineon's counterclaims, the Court raised, *sua sponte,* the question whether Infineon could properly assert a constructive fraud claim based on a negligent *omission.* However, at that time, the motion to dismiss was denied and Infineon was allowed to proceed on the claim for constructive fraud so that, if the evidence established such a claim, it would be redressable.

■ Notwithstanding that Rambus, in pressing its motion to dismiss, failed to initially raise the argument that Virginia law did not permit a claim for negligent omission, nor did it assert that argument as grounds for JMOL at trial or in the current motion, further independent consideration of the matter reveals that Count 11 should not have been submitted to the jury because constructive fraud cannot, as a matter of Virginia law, be premised on an fraudulent omission or concealment of a material fact. Instead, "a claim for fraud by omission requires *deliberate* non-disclosure" *Bank of Montreal v. Signet Bank,* 193 F.3d 818, 833 (4th Cir.1999) (emphasis added) (citing *Hitachi Credit America*

*Corp. v. Signet Bank,* 166 F.3d 614, 628 (4th Cir.1999)), which, of course, precludes a claim for constructive fraud. The Fourth Circuit further explained that:

[t]his observation is confirmed by the Supreme Court of Virginia, which requires "either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact" in a concealment claim.

*Id.* (citing *Norris v. Mitchell,* 255 Va. 235, 495 S.E.2d 809, 812 (1998)). The constructive fraud claim, as pleaded and proved, should not have been presented to the jury; therefore, JMOL is granted in favor of Rambus on Count 11 and the jury verdict finding liability on that count is set aside.

## C. The Actual Fraud Verdict As To Rambus' Conduct Respecting The JEDEC SDRAM Standard–Setting Process

■ To support a claim of actual fraud, the plaintiff must prove: (1) a false representation or an omission (when there is a duty to disclose); (2) of a material fact; (3) made intentionally and knowingly; (4) with the intent to mislead; (5) reasonable reliance by the party mislead; and (6) resulting damage to the party misled. *See ITT Hartford Group, Inc. v. Virginia Finan. Assoc., Inc.,* 258 Va. 193, 520 S.E.2d 355, 361 (1999); *McDaniel v. Hodges,* 176 Va. 519, 11 S.E.2d 623, 625 (1940). *See also Bank of Montreal v. Signet Bank,* 193 F.3d 818, 829 (4th Cir.1999) (a duty to disclose may arise if (1) a fact is material and the one concealing it has superior knowledge and knows that the other is acting upon the assumption that the fact does not exist or (2) if one party diverts the other from making prudent investigations); *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 597 (1984) ("Concealment of a material fact by one who

knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud.").

Rambus contends that it is entitled to JMOL on the actual fraud claim because Infineon failed to prove that: (1) Rambus had a duty to disclose its patents and patent applications; (2) Rambus violated that duty; (3) Rambus intended to mislead Infineon; (4) Infineon's reliance was reasonable; and (5) Infineon sustained pecuniary damage caused by the fraud. As explained below, the clear and convincing evidence presented at trial permitted the jury to conclude that Rambus committed actual fraud as to the SDRAM standard-setting process at JEDEC.

### 1. The Duty To Disclose Pending Patent Applications

■ As an initial matter, Rambus acknowledges that it had a duty to disclose any issued patents while it was a member of JEDEC and participated in JEDEC's standard-setting process. Thus, the dispute at trial was whether *patent applications* were required to be disclosed. Rambus argues that, during the relevant timeframe when the SDRAM standard was being considered by Committee JC–42.3, JEDEC policy required only the disclosure of issued patents, not patent applications. Thus, because Rambus did not obtain its first patent until September 1993 (the '703 patent), it contends that it complied with JEDEC policy by disclosing that patent.

The evidence presented by Infineon at trial, however, tells a different story. Infineon presented testimony from three JEDEC representatives indicating that JEDEC policy always required the disclosure of pending patent applications, notwithstanding the absence of language to that effect in the JEDEC manual before 1993. For example, John Kelly, who is the president and former legal counsel of JEDEC, agreed at trial that, although the language of the manual changed in 1993, the JEDEC policy requiring disclosure of patent applications did *not* change from 1991 to 1996. Former chairman of Committee JC–42.3 and JEDEC attendee from 1984–1998, Gordon Kelley, testified that: (1) before placing the requirement to disclose pending patent applications in the manual, the committee practiced that requirement; (2) the use of the term "known patent" in the pre–1993 JEDEC manuals applied to patent applications as well; and (3) from the discussions at every JEDEC meeting from 1991 to 1996, it was very clear to the membership that disclosure of applicable patents and patent applications was a requirement because it was key to the operation of the committee. Reese Brown, a JEDEC consultant and member of Committee JC–42.3 for 25 years, testified that, during the SDRAM standardization process from 1991 to 1996, if a member had a pending patent application relating to the standardization effort, the member had a duty to disclose the pending patent.

The testimony of those witnesses respecting the policy and practice at JEDEC was corroborated by the evidence from JEDEC's meeting minutes documenting that members of JEDEC actually disclosed pending patents prior to 1993. The fact that JEDEC members disclosed otherwise confidential patent applications during the applicable time period further underscores the existence of a duty to disclose at JEDEC because, absent a duty imposed by JEDEC membership,[2] there is

---

2. Rambus also argues that there is no case law supporting the notion that a patent applicant may be sanctioned for its failure to dis-

close a *confidential* patent application. While Rambus is correct in its assertion that a patent applicant has no general obligation

an entitlement to keep patent applications secret.

Furthermore, Infineon demonstrated that Rambus officials themselves understood that it was JEDEC's practice to require disclosure of pending patent applications. For example, an email from Rambus' president David Mooring reported the events of a JEDEC meeting and stated:

> IBM raised the issue that they were aware that some "voting" JEDEC attendees have *patents pending* on SDRAMs that they have not made the commit[t]ee aware of. They will come to the next meeting with a list of the offenders.

Likewise, after attending a JEDEC meeting, Rambus representative Billy Garrett reported that "Fujitsu indicated that they do have patents applied for, but that they will comply with the JEDEC requirements to make it a standard!!!". Both the Mooring email and the Garrett notes were written in 1992, well within the timeframe of the SDRAM standard-setting effort.

Viewing the evidence in the light most favorable to Infineon, the jury reasonably could have concluded, on the basis of clear and convincing evidence, that, (notwithstanding the absence, until 1993, of an explicit reference to pending patents in the JEDEC manual), all members, at all times here pertinent, had a known duty to disclose patent applications that related to the SDRAM standard-setting effort. Therefore, Rambus' motion for JMOL on this ground is denied.

## 2. The Patents That Should Have Been Disclosed

Rambus next argues that Infineon failed to present any evidence at trial identifying the patent applications that were pending during Rambus' JEDEC membership which related to the proposed SDRAM standard. Thus, in its view, Infineon failed to show that the duty to disclose a pending patent was triggered.

The evidence presented at trial established that, throughout its membership in JEDEC, Rambus had pending applications relating to JEDEC's SDRAM work and that Rambus drafted more patent claims intentionally designed to cover the technology under consideration by JEDEC, thereby generating additional patent applications. Rambus had pending patent claims relating to 2–bank SDRAM designs, externally supplied reference voltage, phase lock loops (PLLs), programmable CAS latency and programmable burst length. For example, the evidence shows that, when JEDEC discussed adding a 2–bank design and burst-length technology to the SDRAM standard, Rambus had claims relating to those technologies pending in its first patent application, the '898 application. Additionally, Patent Application No. 07/954,945, which was filed in September 1992 and issued in June 1994 as U.S. Patent No. 5,319,755, contains claims directed toward programmable burst length.

Infineon also presented evidence establishing that U.S. Patent Application No. 07/847,961, which was filed by Rambus in March 1992 but was eventually abandoned, contains claims directed toward CAS latency, a technology that was incorporated into the SDRAM standard. Similarly, Patent Application No. 07/847,651, which was filed in March 1992 and issued as U.S. Patent No. 5,606,717 in February 1997, contain claims directed to CAS latency as well. As to PLL technology, which was discussed at JEDEC presentations in 1994

---

to reveal its confidential application, that principle is overridden where the party is voluntarily a member in an organization which imposes a duty to disclose those otherwise confidential applications.

and 1995, Rambus had pending claims relating this technology in Patent Application No. 07/847,692, which was filed in March 1992, but was abandoned. Lastly, Rambus' Patent Application No. 07/847,532, which was filed in March 1992 and issued as U.S. Patent No. 5,473,575 in December 1995, contains claims directed to an externally supplied reference voltage. JEDEC discussed this technology in 1992 and it was ultimately incorporated into the SDRAM standard.[3]

Rambus argues that this aspect of Infineons' claim fails because Infineon presented no expert testimony respecting the scope of the Rambus patents or patent applications and their relationship to JEDEC's SDRAM standard-setting effort. That argument misses the mark because the connection between Rambus' patents and the SDRAM standard was sufficiently established through testimony given, and the documents generated, by Rambus' executives. Although Infineon presented evidence too voluminous to catalog about Rambus' pervasive expansion of its pending patent portfolio in response to discussions held at JEDEC standard-setting meetings, a few examples of that evidence help to illustrate the connection established at trial between the patents and JEDEC work. For instance, Richard

Crisp testified that, while it was a member of JEDEC, Rambus repeatedly revised pending claims and drafted new claims for inclusion in pending or about-to-be-filed applications in order to cover JEDEC's proposed SDRAM standard. In May 1992, Crisp met with Rambus' patent attorney to "add claims to our patent application broad enough to cover the SDRAM if the SDRAM uses mode register and programmable CAS latency." These features recently had been discussed at a JEDEC meeting which Crisp attended. Emails sent by Crisp during those meetings also shows that Rambus had patents covering externally supplied reference voltage technology, a topic then being discussed at the JEDEC standard-setting meetings.[4]

Similarly Rambus' Chief Executive Officer Geoff Tate admitted that Rambus intentionally drafted claims to cover SDRAMs in the early 1990s. The documents exchanged between Rambus' patent attorney Lester Vincent, Crisp and other Rambus employees further proved the extensive efforts to revise patent applications or draft new ones for the purpose of securing patent protection for the very technologies chosen for incorporation into JEDEC's forthcoming standard.

---

3. Rambus contends that Infineon's positions on the relevancy of certain patents are patently inconsistent. For example, Infineon has argued that disclosure of the '703 patent, which would then reveal the 1990 '898 application, did not satisfy Rambus' duty to disclose because those patents are directed primarily to the RDRAM technology. *See* Section II.C.3, *infra*. However, in the context of arguing which patents should have been disclosed, Infineon contends that certain claims in the '898 patent should have been made known to JEDEC.

Rambus' attack is specious. The answer lies in recognizing that the JEDEC policy requires disclosure of all patents and patent applications which "related" to the work of JEDEC. The basis for the broader scope of this policy is quite clear because the patent holder or applicant is in the best position to determine the scope of its intellectual property claim and, therefore, its application to JEDEC's work. Here, Rambus clearly knew that it was in the process of expanding the claims based on the '898 patent to cover SDRAM technology.

4. Crisp often composed and sent email messages back to Rambus' executives and in-house counsel while discussions at JEDEC meetings were taking place. Other communications were sent during recesses between standard-setting sessions.

Thus, Infineon proved, by clear and convincing evidence, that the duty to disclose was triggered because several of Rambus' pending patents related to JEDEC's SDRAM standard-setting effort. The JEDEC Manual unambiguously states that the patent disclosure policy applied to any patents or pending patents "that might be involved in the work [the JEDEC committee is] undertaking" and Infineon's witnesses testified that this requirement was practiced prior to 1993. Infineon's evidence showed that Rambus had patents pending on a two bank design, programmable CAS latency, programmable burst length, PLL and an externally supplied reference voltage, all of which related to JEDEC's standardization efforts. Because the jury reasonably could have drawn the conclusion that these patents should have been disclosed, the motion for JMOL on this ground is denied.

### 3. Breach Of The Duty To Disclose

Rambus next argues that Infineon failed to prove that Rambus breached the duty to disclose its patents and patent applications. Specifically, Rambus asserts that, because the applications for the patents-in-suit were not filed or issued until after Rambus left JEDEC, no patents or pending patents existed for Rambus to disclose. Rambus' argument, however, proceeds upon an artificial limitation of the scope of the fraud alleged and proven by Infineon. Infineon did not circumscribe its fraud claim only to the four patents-in-suit; instead, it alleged that Rambus committed fraud upon Infineon (as a member of the JEDEC committee), by failing to disclose *any* pending patents related to the SDRAM work. Moreover, Rambus simply ignores the evidence that the patents-in-suit are merely refinements of the continuation and divisional applications that were pending while Rambus was a member of JEDEC and that were themselves revised

to ensure that Rambus' patents would cover products compliant with the forthcoming JEDEC standard.

As an alternate argument, Rambus contends that it satisfied its duty of disclosure. Specifically, it points to: (1) discussions in JEDEC meetings about the public international patent application (which shares an identical written description to the patents in the U.S. Patent family tree); (2) the disclosure of Rambus' Technical Description to Siemens (a corporate predecessor of Infineon) in the early 1990s; (3) the disclosure by Richard Crisp of the '703 patent in a September 1993 JEDEC meeting; and (4) the disclosure of numerous patents in its withdrawal letter from JEDEC.

Rambus' application for an international patent (through the World Intellectual Property Organization, or "WIPO") became public information in October 1991. This WIPO application contains the same written description as its U.S. counterpart—the undisclosed '898 application filed in April 1990. Likewise, the undisclosed divisional and continuation applications originating from the 1990 application share this same written description. Thus, Rambus posits that it met its duty because the SDRAM applications (that were not disclosed), as well as the patents-in-suit, are based on the very same written description as in the WIPO application.

Similarly, Rambus also contends that it met its disclosure obligation by sharing its Technical Description with Infineon's predecessor, Siemens, in November 1990. The Technical Description, which is based on the written description of the patents, was used by Rambus as an informational document in its early licensing discussions with various semiconductor manufacturers in connection with RDRAM technology. Rambus alleges that, during the licensing

negotiations, it revealed much of its patent portfolio to Infineon (and other JEDEC members), though at that time, Rambus did not yet have any issued patents.

The evidence presented by Infineon, however, permitted the jury to conclude that the discussions between Rambus and Siemens, focused solely on *RDRAMs*. Rambus offered no evidence demonstrating that it ever told Siemens that it believed its Technical Description could cover SDRAMs, as well as RDRAMs. This same shortcoming applies to the WIPO patent application; while the written description may be the same as that in the undisclosed SDRAM patents, Rambus presented no evidence at trial indicating that the description, on its face, relates to SDRAMs. Further, at the relevant time, the WIPO patent claims based on that written description related to only RDRAM, as reflected in Rambus' pleadings in earlier motions for summary judgment.

As a third theory of compliance with its duty to disclose, Rambus argues that disclosure of the '703 patent was sufficient. Although Richard Crisp testified that the '703 patent related only to RDRAMs, Rambus contends now that, with the revelation of this patent, all Rambus' other patents and patent applications were revealed. Thus, any JEDEC member could obtain copies of the original '898 application; the continuation application that resulted in U.S. Patent No. 5,319,755 ("the '755 patent"); and the prosecution history of the '755 patent, which is the progenitor of three of the patents-in-suit, and is the first patent issued to Rambus which relates to SDRAMs.

Infineon, however, proved that revelation of the '703 patent, if anything, actually misrepresented the scope of Rambus' pending patents because the '703 patent admittedly did not relate to the SDRAM work of the committee and, when Crisp revealed the patent, he failed to say anything about Rambus' numerous other pending applications, which *did* relate to the SDRAM standardization work. Furthermore, as to the '755 patent, Infineon demonstrated that (even if one were to have investigated the history of this patent) the '703 patent *did not* disclose the application for the '755 patent because the '703 patent application only cross-referenced those patent applications pending at the time that the '703 application was filed. Because the application for the '755 patent was filed *after* the '703 application, the '755 patent *was not included in the patent history of the '703.* Infineon offered evidence from which the jury could conclude that the '703 patent did not reveal the '755 patent and Rambus offered no evidence to the contrary.

Lastly, Rambus asserts that the letter by which it withdrew from JEDEC disclosed every patent issued to Rambus as of June 1996 which related to SDRAMs. That is not borne out by the evidence. Indeed, a key patent, U.S. Patent No. 5,513,327, was omitted from the list. Rambus asserted that the omission was inadvertent. Infineon offered evidence that the omission was deliberate. Further, Rambus contends that the withdrawal letter satisfied the duty to disclose because Rambus stated therein that it "has applied for a number of patents in order to protect Rambus technology." However, there was no evidence that this disclosure satisfied the requirements of JEDEC's patent disclosure policy; and the text certainly does not disclose that Rambus had applied for patents that encompassed the JEDEC SDRAM standard.

In sum, clear and convincing evidence supports the jury's finding that Rambus breached its duty to disclose its patents and patent applications. The jury reason-

ably could have believed that the existence of the public WIPO application was not sufficient to satisfy the duty to disclose because the written description contained therein gave no indication that Rambus intended to expand its patent applications to cover SDRAMs. The jury, again, could reasonably conclude that the licensing discussions between Rambus and Siemens/Infineon were limited to RDRAM and that Siemens/Infineon had no reason to believe that Rambus intended to expand its intellectual property beyond RDRAMs. As to the disclosure of the '703 patent, Rambus admits that this patent related only to RDRAM. Although Rambus makes the argument that the '703 disclosed every then-pending patent, the evidence at trial supports the conclusion that, if one traced Rambus' rather voluminous patent tree from the '703 patent, one would not discover the '755 patent application. Lastly, there was no evidence demonstrating that Rambus' withdrawal letter, or the list of patents attached thereto, satisfied that duty.

### 4. Evidence Of Intent to Mislead

Rambus contends that the jury verdict finding Rambus liable for actual fraud is unsupported by the evidence because Infineon failed to show that Rambus acted knowingly and intentionally with the intent to mislead. *See Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.,* 256 Va. 553, 507 S.E.2d 344, 346 (1998) (the misrepresentation or omission must be made knowingly and intentionally). *See also Bank of Montreal,* 193 F.3d at 833 ("a claim for fraud by omission requires deliberate non-disclosure"). Instead, Rambus contends that the evidence could support, at most, the conclusion that Rambus mistakenly believed that it had no duty to disclose patent applications.

That argument is utterly without merit. Infineon, for example, proved that Rambus' president, David Mooring, and its JEDEC representatives, Garrett and Crisp, knew of the disclosure obligation. Rambus' executives discussed these duties with the lawyers who were prosecuting the company's patent applications. Rambus' conduct, viewed in light of that knowledge, underscores the proof of scienter. Thus, Infineon, demonstrated that Rambus, through its executives, sought to patent the technology being discussed at JEDEC so that it could later bring patent infringement suits. Furthermore, e-mails written by Richard Crisp show that, rather than informing JEDEC about its issued and pending patents, Rambus intentionally decided to keep these secret. For example, after being questioned about Rambus patents on the Synclink proposal (a technology not at issue in this action), Crisp wrote to the executives at Rambus the following:

> We may want to walk into the next JEDEC meeting and simply provide a list of patent numbers which have issued and say "we are not lawyers, we will pass no judgment of infringement or non-infringement, but here are our issued patent numbers, you decide for yourselves what does and does not infringe." On the other hand, we may not want to make it easy for all to figure out what we have especially if nothing looks really strong. If we have a really strong one that has issued that is key to the operation of the SLDRAM, then we may want to play that card, but again with the above suggested disclaimer.

A second email written by Crisp also discloses an intent to deliberately remain silent about the company's patents and patent applications. After attending a JEDEC meeting in which a JEDEC member presented a proposal describing the advantages of incorporating an on-chip PLL in the SDRAM, Crisp wrote:

They plan on putting a PLL on board their SDRAMs to improve the output delay by about 2 ns. They want to put the PLL on every chip and let the user use it or not depending on whether they need it ... Obviously we need to think about our patent position on this for potential discussion with NEC regarding patent issues here. * * * I believe that we now have seen that others are seriously planning inclusion of PLLs on board SDRAMS ... What is the exact status of the patent with the PLL claim?* * *

Lastly, Rambus' own documents refute the notion that it harbored the mistaken belief that patent *applications* were not required to be disclosed. In his notes regarding the Synclink proposal, Crisp stated that "Synclink is being sponsored by an organization with *a less stringent patent policy than JEDEC.*" (emphasis added). In other words, under a less demanding non-JEDEC standard-setting process, patentees were "free to patent whatever they desire, and are not bound to relinquish any of their rights to their patents by presenting their ideas for standardization." The clear inference of Crisp's statement, and the one drawn by the jury, is that Crisp believed that JEDEC had a more restrictive patent policy which imposed a duty of disclosure and limited the ability to patent subject matter considered by the standard-setting body. Other documents presented at trial from Rambus' executives also demonstrate that Rambus clearly understood the scope of the patent policy.

Rambus' argument that it had only a mistaken belief regarding JEDEC's disclosure policy presents no basis upon which to grant JMOL, for there is ample evidence of scienter.

### 5. Reasonable Reliance

Rambus next argues that Infineon failed to show that its reliance on Rambus' non-disclosures at JEDEC meetings was reasonable under the circumstances. *See McDaniel v. Hodges*, 176 Va. 519, 11 S.E.2d 623, 625 (1940).[5] Infineon agrees that its reliance had to have been reasonable, but asserts that its reliance was, in fact, reasonable.

Rambus argues that Infineon's reliance cannot be considered in the vacuum of JEDEC activities, but instead must be viewed in light of the relationship between the parties—a relationship that began several years before Infineon designed its first SDRAM in 1996. To support that argument, Rambus again points to the RDRAM licensing discussions between Rambus and Siemens in 1991 and argues that, during those discussions, Siemens thoroughly studied all of Rambus' technology. Rambus also contends that executives at Siemens realized that Rambus' technology could have a broader scope that just RDRAMS, therefore any reliance on Rambus' silence at JEDEC was unreasonable.

Infineon offered proof from which the jury could have found that the course of conduct between the parties reveals not that Infineon *knew* of the patents, but rather that it had concerns about Rambus' patent rights. Infineon also proved that

---

**5.** *McDaniel* states that "[i]f one represents as true what is false, in such a way as to induce a *reasonable* man to believe it, and the representation is meant to be acted upon and he to whom the representation is made, believing it to be true, acts on it, and thereby sustains damage, there is ground to support an action of deceit at law ..." *Id.* (emphasis added). More recent Supreme Court of Virginia decisional law omits any requirement of reasonableness. *See e.g. Richmond Metro. Auth.*, 256 Va. 553, 507 S.E.2d at 346. At the request of Rambus, the jury in this case was instructed that reliance must be reasonable.

Rambus intentionally misled Infineon when it and other JEDEC members raised those concerns with Rambus, thus inducing Infineon to believe that Rambus did not have any SDRAM patents or applications. For example, Rambus presented documents and testimony indicating that Willibald Meyer, Infineon's JEDEC representative, had concerns as early as 1992 that Rambus may have patent applications addressed to the 2–bank SDRAM design then being considered by JEDEC. In pursuing this concern, at a May 1992 JEDEC meeting, Meyer requested the Chairman of Committee JC–42.3, Gordon Kelley, to ask Richard Crisp about Rambus' patent rights relating to the 2–bank SDRAM. Crisp made no disclosure, leading Meyer and others to believe that Rambus had nothing that required disclosure. At this same 1992 JEDEC meeting, another JEDEC member mentioned that Rambus had an international patent application (the WIPO application), but that the patent claims were likely invalidated by prior art. Rambus again made no disclosure.

Infineon also presented testimony from Meyer indicating that he was misled by the disclosure of the '703 patent because, when he read that patent, he concluded that Rambus' technology therein disclosed related only to RDRAMs. Rambus took, in this litigation, that very same position in the motions for summary judgment. The jury then was entitled to find that Meyer's assessment was a reasonable one. Lastly, Infineon presented documents from Meyer, composed at the time the SDRAM standard was under consideration, indicating that Meyer believed the JEDEC

SDRAM standard was "public domain," which again supports the jury's conclusion.

Without weighing the credibility of the evidence, there was more than one reasonable conclusion that could be drawn from the evidence regarding the reasonableness of Infineon's reliance and the jury's conclusion that Infineon acted reasonably is supported by clear and convincing evidence. Therefore, Rambus' motion for JMOL on this ground is denied.

### 6. Harm Caused By The Fraud

■ Rambus contends that JMOL must be granted in its favor because the only injury that Infineon claims to have suffered as a result of the fraud is the incurrence of attorneys' fees and, as a matter of law, attorneys' fees cannot be the damage or injury element of a claim for fraud under Virginia law. *See ITT Hartford Group, Inc. v. Virginia Finan. Assoc., Inc.*, 258 Va. 193, 520 S.E.2d 355, 361 (1999) (to support a claim of fraud, the plaintiff must prove resulting damage to the complaining party). Rambus is correct in asserting that the only monetary injury[6] claimed by Infineon as the injury component of its fraud claim is the attorneys' fees it paid to the law firm of Slater & Matsil to review, and help outline the defense of, Rambus' infringement claims.[7]

■ Analysis of the issue begins with recognition that Virginia follows the general "American Rule" that "in the absence of any contractual or statutory liability therefor, attorneys' fees and expenses incurred by the plaintiff in the litigation of his claim

6. Infineon also showed that it was injured by the fraud in another way, specifically in the risk of its investment in product design, and plant to build its JEDEC compliant SDRAM products, much of which would be jeopardized if its products infringed any of Rambus' patents, the non-disclosure of the applications for which was instrumental in the final content of the JEDEC standard.

7. Infineon did not seek to recover those fees paid to its current trial counsel, the law firm of Kirkland & Ellis, though it also prepared a defense to the infringement claims.

against the defendant ... are not recoverable ..." *Hiss v. Friedberg,* 201 Va. 572, 112 S.E.2d 871, 875 (1960). *See also Prospect Dev. Co. v. Bershader,* 258 Va. 75, 515 S.E.2d 291, 300 (1999) ("The general rule in this Commonwealth is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party."); 44 A.L.R.4th 776, § 2(a) ("The general rule carried over from common law is that a successful party in litigation is not entitled to recover from his opponent the attorneys' fees."). Other than the nominal, statutory costs, incurred in prosecuting or defending the action.

Infineon argues that this case is an exception to the general rule because the attorneys' fees it paid are a damage or injury proximately caused by the fraud committed by Rambus. Specifically, Infineon showed at trial that it was forced to pay attorneys' fees to Slater & Matsil in connection with the analysis and defense of Rambus' patent infringement charges. Also, Infineon presented evidence in the form of Rambus' business plans and testimony from which the jury could have concluded that the patent infringement suit was part and parcel of Rambus' fraud—the last step in the fraud. Infineon proved that, because of Rambus' fraudulent behavior while it was a member of JEDEC, Infineon designed the JEDEC compliant products which were alleged to have infringed the patents-in-suit. When Rambus instituted the final step in its fraudulent plan by charging that those patents were infringed by JEDEC-compliant SDRAM products, Rambus caused Infineon to expend substantial sums of money to investigate the merits of, and defend against, the infringement claims.[8]

### a. Exceptions To The General Rule

There are several exceptions to the American rule foreclosing recovery of attorneys' fees in most cases. For example, courts generally allow a party to recover attorneys' fees when the "tort of another" has caused him to incur attorneys' fees during litigation with a third party. The Restatement (Second) of Torts § 914 (1979) explains:

§ 914. EXPENSE OF LITIGATION

(1) The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation.

(2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

*Accord Brochner v. Western Ins. Co.,* 724 P.2d 1293, 1299 (Colo.1986); *Tetherow v. Wolfe,* 223 Neb. 631, 392 N.W.2d 374, 379 (1986); *Pullman Standard, Inc. v. Abex Corp.,* 693 S.W.2d 336, 340 (Tenn.1985); *Gray v. Don Miller & Assoc., Inc.,* 35 Cal.3d 498, 198 Cal.Rptr. 551, 674 P.2d 253, 258 (1984); *Department of Envtl. Prot. v. Ventron Corp.,* 94 N.J. 473, 468 A.2d 150, 166 (N.J.1983).

Virginia courts have adopted that exception by recognizing the analogous principle that "where a breach of contract has forced the plaintiff to maintain or defend a suit with a third person, he may recover the counsel fees incurred by him in the former suit provided they are reasonable in amount and reasonably incurred."

---

8. The attorneys' fees alleged as injury in the fraud claim are not those which Infineon may recover under 35 U.S.C. § 285 (exceptional case fees) or as a prevailing party on its fraud claim.

*Hiss,* 201 Va. 572, 112 S.E.2d at 875–76. *See also Owen v. Shelton,* 221 Va. 1051, 277 S.E.2d 189, 192 (1981); *Cemetery Consultants, Inc. v. Ware,* 211 Va. 784, 180 S.E.2d 528 (1971). In those cases, the attorneys' fees were not awarded to a party because of his status as a prevailing party, but instead were permitted as an element of the injury caused by the defendant's conduct. *See Hiss,* 201 Va. 572, 112 S.E.2d at 875 ("The troublesome question is whether in this action for breach of contract the [plaintiffs] are entitled to recover of [the defendants] as *an element of their damages* the costs of their litigation, including counsel fees, with [a third party].") (emphasis added). The recovery of fees in cases of that sort, however, generally has been limited to fees incurred during litigation with *third parties,* not in antecedent litigation between the same parties. *See Hiss,* 201 Va. 572, 112 S.E.2d at 875 ("Nor are attorneys' fees and other expenses incurred in former litigation between the same parties recoverable in a subsequent action.") (citing Am.Jur. Damages, § 142, pp. 500, 551; *Burruss v. Hines,* 94 Va. 413, 26 S.E. 875 (1897); *Wisecarver v. Wisecarver,* 97 Va. 452, 34 S.E. 56 (1899)).

Nevertheless, it is generally recognized that, in an appropriate case, a party also can recover attorneys' fees incurred in previous litigation between the *same* parties:

As a general rule, litigation costs and attorney's fees incurred in prior litiga-

tion against the same defendant are not recoverable in subsequent action. *However, the rule is different if the plaintiff has a cause of action for financial loss resulting directly from the previous action.* Thus, counsel fees and other reasonable expenses damages in defending a suit that was maliciously instituted against the plaintiff may be recovered in the action for malicious prosecution. *Also, an exception to the general rule exists if the wrongful action of the defendant has placed the plaintiff in such a position that it is necessary to incur legal expenses to protect his interest.*

22 Am.Jur.2d Damages § 617 (1988) (emphasis added). Virginia courts have recognized this exception and have allowed attorneys' fees incurred in previous litigation between the same parties to be recovered as damage in actions for the intentional torts of malicious prosecution and false imprisonment.[9]

For example, in *Burruss v. Hines,* 94 Va. 413, 26 S.E. 875, 878 (1897), the Supreme Court of Virginia explained that "[t]he general rule is that counsel fees are not recoverable as damages; but on the trial of an action for malicious prosecution or false imprisonment, where exemplary damages are recoverable, the fees paid or incurred to counsel for defending the original suit or proceeding may be proved, and if reasonable and necessarily incurred, may be taken into consideration by the jury in the assessment of damages." Similarly, in actions for false imprisonment

---

9. The Supreme Court of Virginia has also: permitted a trustee, who defended his trust in good faith, to recover attorney's fees from the estate, *Cooper v. Brodie,* 253 Va. 38, 44, 480 S.E.2d 101, 104 (1997), and we have approved an award of attorney's fees in certain cases involving alimony and support disputes even though such awards of attorney's fees were neither authorized by statute nor by contract. *See Carswell v.*

*Masterson,* 224 Va. 329, 331–32, 295 S.E.2d 899, 900–01 (1982); *Alig v. Alig,* 220 Va. 80, 86, 255 S.E.2d 494, 498 (1979); *McKeel v. McKeel,* 185 Va. 108, 116–17, 37 S.E.2d 746, 750–51 (1946); *McClaugherty v. McClaugherty,* 180 Va. 51, 69, 21 S.E.2d 761, 768 (1942); *Heflin v. Heflin,* 177 Va. 385, 399–400, 14 S.E.2d 317, 322 (1941). *Bershader,* 515 S.E.2d at 301.

"damages awarded must be compensatory for the loss of time; for the suffering, bodily and mental, sustained by reason of such wrongful act or acts; and *for expenses incurred in procuring discharge from restraint, including a reasonable attorney's fee.*" *Bolton v. Vellines*, 94 Va. 393, 26 S.E. 847, 850 (1897) (emphasis added). *See also Parsons v. Harper*, 57 Va. 64, 1860 WL 4034, * 6 (Va.1860) (allowing recovery of attorneys' fees for action for false imprisonment).[10]

■ To recover attorneys' fees, however, Virginia law requires a showing that the injury inflicted in the underlying action was wanton or malicious. "The rule in Virginia as to the recovery of counsel fees as damages is well established in *Burruss*, *... Parsons ... Wisecarver*, ... and *Morgan v. Haley*, [107 Va. 331, 58 S.E. 564 (1907)], wherein it is held that *except where the injury is wanton or malicious and exemplary damages are recoverable, the allowance of fees paid counsel for defending the original proceedings is not proper.*" *Kemp v. Miller*, 166 Va. 661, 186 S.E. 99, 106 (1936) (emphasis added); *Burruss*, 26 S.E. at 878 ("But if the injury was not wanton or malicious, and exemplary damages are not recoverable, the allowance of counsel fees is improper."). *See also Sperry Rand Corp. v. A–T–O, Inc.*, 447 F.2d 1387, 1394 (4th Cir.1971) (same).

Having explored the landscape of the Virginia rule, the question now becomes whether this case, or any aspect of it, fits within that rule.

### b. Attorneys' Fees As Injury For Actual Fraud

■ It has been observed that, in assessing whether attorneys' fees in an underlying suit can be recovered in an action for fraud, "[t]he rule that attorneys' fees are not recoverable (absent contractual provision or statutory authority), while superficially a bar, is not really applicable." Robert L. Dunn, *Recovery of Damages for Fraud*, § 4.13, pgs. 200–01 (Lawpress 1995). That statement is followed by the explanation that, when a defendant's fraudulent misrepresentations force a party to prosecute or defend other litigation, attorneys' fees incurred in that other litigation are "recoverable when they are proximately caused by a misrepresentation." *Id. See also* 22 Am.Jur.2d Damages § 617 ("Also, an exception to the general rule exists if the wrongful action of the defendant has placed the plaintiff in such a position that it is necessary to incur legal expenses to protect his interest."); 44 A.L.R.4th 776 § 2(a) (1986) ("Courts have allowed recovery of attorneys' fees under a distinct exception permitting the successful party in a fraud action to recover from the losing party the attorneys' fees incurred by the successful party in *prior litigation* or claims involving third parties, which litigation or claims were proximately caused by the fraud perpetrated on the successful party.") (emphasis added).

Numerous jurisdictions have subscribed to this principle by allowing a party to recover attorneys' fees expended in a previous litigation when that litigation was proximately caused by the defendant's fraud. The decisions, however, deal pri-

---

**10.** Infineon argues that the Supreme Court of Virginia allowed attorneys' fees to be recovered as damages for fraud in *Prospect Dev. Co., Inc. v. Bershader*, 258 Va. 75, 515 S.E.2d 291 (1999). While *Bershader* mentions other Virginia decisions which allowed attorney fees to be recovered as an element of dam-

ages, *see e.g. Owen*, 221 Va. 1051, 277 S.E.2d at 192, *Burruss*, 94 Va. 413, 26 S.E. 875 at 878 and *Bolton*, 94 Va. 393, 26 S.E. 847 at 850, *Bershader* is more properly regarded as a case allowing fees to be awarded to a prevailing party.

marily with previous litigation between the plaintiff and a *third* party. *See Feit v. Donahue*, 826 P.2d 407 (Colo.Ct.App.1992) (plaintiff in a real estate fraud case allowed to recover attorneys' fees incurred in attempting to obtain a variance when the seller concealed the fact that a variance was required); *Fagerberg v. LeBlanc*, 164 Mich.App. 349, 416 N.W.2d 438 (1987) (allowing recovery of attorneys' and surveyors' fees where seller fraudulent misrepresented the boundaries of the land); *Gray v. Don Miller & Assoc., Inc.*, 35 Cal.3d 498, 198 Cal.Rptr. 551, 674 P.2d 253 (Ca. 1984) (plaintiff allowed to recover attorneys' fees incurred in prior specific performance suit on the sale of a home when real estate broker falsely represented that an offer had been accepted by the sellers on the home); *Forrester v. State Bank*, 52 Ill.App.3d 34, 6 Ill.Dec. 957, 363 N.E.2d 904 (1977) (allowing a plaintiff in a fraud action to recover attorneys' fees incurred in a prior bankruptcy proceeding against a debtor when the defendant bank fraudulently misrepresented the assets of the debtor); *Turner v. Zip Motors, Inc.*, 245 Iowa 1091, 65 N.W.2d 427 (Iowa 1954) (allowing recovery of attorneys' fees in a prior action for replevin brought by third party and caused by the defendant's agent's conversion of an automobile).

Nevertheless, the fundamental premise upon which attorneys' fees were allowed in those cases is closely akin to the rationale, which is followed in Virginia, for allowing attorneys' fees to be an element of damage or injury in certain intentional torts: when a party's intentionally tortious act forces the other party necessarily to incur attorneys' fees as a direct consequence of that act, the party should be able to recover the attorneys' fees consequentially expended.

Whether that underlying action was between the plaintiff and the tortfeasor or the plaintiff and a third party, the underlying rationale remains the same.

In Virginia, in order to establish a cognizable claim for actual fraud, the plaintiff must establish some type of injury. One seeking to recover for fraud must show that the act resulted "in some *loss, damage, detriment or injury* to him." *Lloyd v. Smith*, 150 Va. 132, 142 S.E. 363, 367 (1928) (emphasis added). Infineon has proved the injury component of its actual fraud claim by demonstrating that: (1) it sustained an injury by incurring attorneys' fees and (2) the need to incur those attorneys' fees was proximately caused by Rambus' fraud.

This case began when Rambus asserted four patents against Infineon's JEDEC-compliant SDRAM and DDR SDRAM products. Infineon was therefore forced to employ attorneys in the investigation of those claims of infringement and in possible defense thereof. Further, the record is: (1) that Infineon had designed its products to comply with the JEDEC standard and built manufacturing lines in Germany and the United States to make those products; and (2) that, if Infineon was to continue to sell those products, it had no choice but to defend the infringement action which was part and parcel of Rambus' fraud.[11] After the Court granted judgment as a matter of law in Infineon's favor on the infringement claims (at the end of Rambus' case-in-chief), Infineon argued that it was nevertheless harmed by Rambus' fraudulent scheme because, even though its products had been determined not to infringe the patents-in-suit, Infineon

---

11. Indeed, Rambus terminated settlement discussions between it and Infineon by filing this action, which Rambus chose to do, not because the discussions were failing, but because Rambus wanted to litigate in this forum and feared that Infineon might sue it in California where the docket proceeds at a slower pace.

had incurred considerable expense in analyzing and outlining a defense to those patent claims.[12]

Thus, Infineon proved that it sustained pecuniary loss as a result of Rambus' intentionally fraudulent behavior at JEDEC. Indeed, the defense of the patent suit was "a direct and necessary consequence," *Hiss*, 201 Va. 572, 112 S.E.2d at 876, of Rambus' plan to attend JEDEC, remain silent about its patent applications, obtain additional patent claims that covered JEDEC technology, and then assert those patents against JEDEC members whose products conformed to the JEDEC standard in order to obtain their assent to license agreements.

The result reached here comports with the conclusion reached by the Seventh Circuit in *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266 (7th Cir.1996), *cert. denied* 519 U.S. 928, 117 S.Ct. 297, 136 L.Ed.2d 215 (1996) under similar facts in a fraud case. Applying Illinois law, the *Roboserve* court explained that "[c]ompensatory damages for fraud are intended to compensate for any injury which is the direct and natural consequence of the plaintiff's acting on the faith of defendant's representations." *Id.* at 273–74 (internal quotations omitted). Thus, the plaintiff could recover its "out-of-pocket" expenses, including attorneys' fees expended in reliance on that misrepresentation. *Id.* at 274. Because the defendant fraudulently led the plaintiff to believe that it would be awarded a contract to provide services to a hotel, the plaintiff could recover attorneys' fees expended in preparing new proposals for, and in conducting negotiations to provide, those services. *Id.*[13]

More importantly, it is entirely appropriate, under settled precepts of Virginia law, to allow Infineon to claim attorneys' fees as its injury on the actual fraud claim because the jury found that Rambus had committed the fraud "maliciously or wantonly or oppressively" and awarded $3.5 million in punitive damages on Infineon's actual fraud claim.[14] Indeed, a finding of that sort supplied the raison d'etre for sustaining an award of attorneys' fees between the same parties in a malicious prosecution or false imprisonment case under Virginia law. Thus, the award of attorneys' fees is appropriate in the present fraud action because "the injury is wanton or malicious and exemplary damages are recoverable." *Kemp*, 186 S.E. at 105. *See also Sperry Rand*, 447 F.2d at 1393.

To hold otherwise would effect an inequitable result. Contrary to Rambus' argument, Infineon was not insulated from the fraud injury merely because Infineon prevailed on the patent infringement aspect of this action. Infineon escaped one possible harm which could have resulted from the fraud—namely, being found liable for infringing the patents-in-suit after having made a substantial investment in research and development of its products and set-

---

**12.** Although Infineon put forth evidence regarding the amount of attorneys' fees paid to the law firm of Slater & Matsil in connection with the defense of the patent infringement suit, the Court struck that evidence because Infineon failed to prove that those fees were "reasonable in amount and reasonably incurred." *Owen*, 221 Va. 1051, 277 S.E.2d at 192. Nonetheless, the undisputed record shows that Infineon incurred attorneys' fees in an amount not proved, to defend the last stage of the Rambus fraud found by the jury.

**13.** Similarly, in *Advantor Capital Corp. v. Yeary*, 136 F.3d 1259 (10th Cir.1998), in an action for fraud and abuse of process, the Tenth Circuit allowed a plaintiff to recover its attorneys' fees incurred in a prior litigation.

**14.** Pursuant to Va.Code § 8.01–38.1, the Court reduced that amount to $350,000.00.

ting up manufacturing facilities to produce the allegedly infringing computer memory chip.[15] Faced with that risk of harm, Infineon had no viable option other than to have a law firm analyze the infringement claims made by Rambus before the litigation began and to help structure a defense to the litigation once Rambus instituted this action. Further efforts to reach a business compromise were essentially foreclosed when Rambus commenced infringement litigation here and in Germany. Yet, the attorneys' fees would not have been sustained (and the current dispute avoided entirely) if Rambus had made the disclosures required by the JEDEC policy because the JEDEC committee could have revised the standard, Infineon could have designed its products differently or Infineon could have negotiated reasonable royalty rates from Rambus *before* it had invested in the set up of its manufacturing lines (a factor which of course, injects strong adverse leverage into the negotiating equation).

To accept the contention that Infineon has suffered no harm simply because it prevailed on Rambus' patent infringement action would be to allow Rambus to secure a windfall from the fraud that the jury found it had committed.

#### c. The *Noerr–Pennington Doctrine*

■■■ Rambus contends that Infineon's attorneys' fees cannot be recovered in an action for fraud because the *Noerr–Pennington* doctrine protects a litigant's First Amendment right to prosecute lawsuits without fear of being required to pay an adversary's litigation costs. *See Eastern*

*R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine, which has its foundation in the First Amendment, protects the rights of persons to petition the government legislatively, judicially or administratively because such action is constitutionally protected speech apart from the motivation behind it. *Id.*

Rambus raises this argument too late. "[T]he *Noerr–Pennington* doctrine should be raised as an affirmative defense." *Bayou Fleet, Inc. v. Alexander,* 234 F.3d 852, 860 (5th Cir.2000), *cert. denied* —— U.S. ——, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001). *See also Acoustic Systems, Inc. v. Wenger Corp.,* 207 F.3d 287 (5th Cir.2000) (same). "Generally, a party's failure to raise an affirmative defense in its first responsive pleading results in waiver." *Bayou Fleet,* 234 F.3d at 860. However, there are limited exceptions to this rule when the failure to raise a defense would not result in unfair surprise or prejudice to the other party.

Rambus' failure to plead the *Noerr–Pennington* doctrine as an affirmative defense forecloses consideration of that defense now because to consider it at this late stage would be unfairly prejudicial to Infineon and therefore the issue will not be considered.[16]

#### d. Conclusion

Attorneys' fees incurred as a direct result of the defendant's fraudulent conduct

---

15. Infineon remains exposed to possible claims of infringement of other Rambus patents, the concealment of the applications for which were instrumental to the ultimate content of the JEDEC SDRAM standard. That exposure, too, is an injury attributable to the fraud which is to be remedied by injunction.

16. Rambus first raised the issue when it was faced with a motion for judgment as a matter of law near the end of a two week trial. This untimely assertion was unfair to Infineon and the Court refused to consider it then as well.

may be recovered in an action for actual fraud; therefore the motion for JMOL on Count 10 on that ground is denied. Having concluded that each asserted infirmity in the actual fraud verdict is meritless, Rambus' motion for JMOL on Count 10 as to the JEDEC standard-setting process for SDRAM is denied.

### D. The Actual Fraud Verdict As To Rambus' Conduct Respecting The JEDEC DDR SDRAMs Standard–Setting Process

■ Rambus challenges the jury's finding of liability for fraud relating to the conduct of Rambus in the JEDEC DDR SDRAM standard-setting process because, according to Rambus, even if it had a duty to disclose, that duty was not triggered in connection with the DDR SDRAM standard-setting until after Rambus left JEDEC. For that reason, Rambus contends that the finding of fraud as to its conduct in the DDR SDRAM standard-setting process is unsupported by the evidence. As explained below, that contention is well-founded.

To begin, it is necessary to recall that Rambus attended its last JEDEC meeting on December 6, 1995 and that Rambus formally withdrew from JEDEC by a letter dated June 17, 1996. However, JEDEC Committee JC–42.3 did not begin working on the standard for DDR SDRAM until December 1996. In 1998, Infineon first began creating the design for the DDR SDRAM and, in 2000, began manufacturing its DDR SDRAM. JEDEC published the DDR SDRAM standard in 2000.

Whether Rambus had a duty to disclose patents and patent applications relating to the DDR SDRAMs turns on the record respecting *when* Committee JC–42.3 first began work on the DDR SDRAM standard. The parties agree that the DDR SDRAM standard-setting did not formally appear in JEDEC's item log of proposed standards until December 1996. The parties, however, disagree as to when the duty to disclose was triggered. Rambus argues that the duty did not arise until December 1996 when the standard was formally considered by the committee. Infineon, on the other hand, argues that the duty to disclose was triggered earlier than 1996 because certain "concepts", which ultimately made their way into the DDR SDRAM standard, were discussed while Rambus was a member of JEDEC. Specifically, Infineon contends that Committee JC–42.3 considered certain technologies, such as dual edge clocking and on-chip PLL/DLL (delay lock loop), as early as 1992 and that Rambus committed fraud as to the DDR SDRAM because these technologies were ultimately incorporated into the DDR SDRAM standard.

There was evidence to support Infineon's contention that JEDEC members were obligated to make the requisite disclosure when certain technologies were discussed at JEDEC meetings from 1992 through early 1996. However, the Chairman of Committee JC–42.3, Gordon Kelley, testified that the only formal time that the duty to disclose was triggered was during the balloting of a proposed standard, in which a member was asked to declare whether or not it had knowledge of any patents or patent applications. Kelley went on to add, however, that he routinely disclosed patents held by his employer, IBM, if he knew, at the time a proposal was made, that IBM had a patent relating to the new proposal. Yet, Kelley did not testify whether this was his personal practice or an action taken as a result of the JEDEC disclosure policy. Nor did Kelley testify whether the duty to disclose during a presentation on one standard carried over to another standard.

At trial, and during the post-trial motions, Infineon relied primarily on the testimony of Reese Brown, a consultant to JEDEC, to establish the existence of a duty to disclose during the time at issue. Brown testified about several presentations relating to dual edge clocking and PLL/DLL that were made at JEDEC from 1991 to 1996. He stated that, in his view, a JEDEC member would have had a duty to disclose any patent or patent application relating to those dual edge clocking or PLL/DLL presentations. However, each of the discussions to which Brown referred took place in relation to the *SDRAM* standardization effort, not to the *DDR SDRAM* standard. Significantly, Brown also testified that the disclosure duty was triggered only if the "material is described as part of a legitimate proposal that's aimed at a standard." Infineon presented no evidence demonstrating that the dual edge clocking and PLL/DLL technology presentations during the period 1991 through early 1996 were "aimed at" a DDR SDRAM standard. To the extent that Brown's testimony establishes that patents or applications relating to these technologies should have been disclosed, the only standard to which the presentations could have been made was the *SDRAM* standard because it was the only standard under consideration at the time.

Furthermore, Rambus showed, through the testimony of JEDEC representatives, that technology presentations could be made for a variety reasons—sometimes they would be made with the aim of standardizing the technology and other times they would be presented simply for informational purposes only. If the technology was presented for informational purposes only, the presentation would not receive an item number from the committee. Also, absent a ministerial mistake, presentations that were made with the goal of eventually becoming incorporated into a standard were given item numbers. The presentations in 1991–1996 regarding dual edge clocking and PLL/DLL were not given item numbers to become part of the DDR SDRAM standard.

Infineon takes the view that the particular name of a standard should not be dispositive in determining when the committee began consideration of a technology. In its view, JEDEC standardization is a continuing effort, with each technology serving as a building block for later technologies. Those contentions have merit. However, well-taken or not, those points do not mean that JEDEC standard-setting for DDR SDRAMs was underway when the technology presentations at issue were made.

Considering the record as a whole, Infineon has failed to prove, by clear and convincing evidence, that, before the DDR SDRAM standard-setting process actually began, Rambus had a duty to disclose. Further, Rambus was no longer a member of JEDEC when that process began. The evidence on which Infineon pins its contention that the disclosure obligation existed before the standard-setting process began does not qualify as clear and convincing. In fact, Infineon relies almost exclusively on the testimony of Reese Brown, and, although Brown testified that, in his view, a member had a duty to disclose at each of the technology presentations, the duty to which he opined is completely untethered to any specific proposal for a DDR SDRAM standard pending before the JEDEC committee at the time. Also, at the time of each of those presentations, the only standard under consideration was the SDRAM standard. That, considered in perspective of Brown's testimony that the duty to disclose existed only if the "material is described as part of a legitimate proposal that's aimed at a standard,"

makes the evidence too insubstantial to be clear and convincing.

Thus, although Infineon proved that certain technology features discussed during the SDRAM standard-setting process ultimately found their way into the DDR SDRAM standard and that those technologies were discussed at JEDEC meetings while Rambus was present, Infineon did not prove that those discussions were tied to a standard-setting effort for the DDR SDRAM. The resulting evidentiary void requires the conclusion that, there being no duty disclose shown, Rambus is entitled to JMOL on Count 10 insofar as it involves the assertion of fraud in respect of the DDR SDRAM standard-setting process.

### E. Punitive Damages

■ In Virginia, an award of punitive damages may not be made absent an award of compensatory or nominal damages. *Valley Acceptance Corp. v. Glasby*, 230 Va. 422, 337 S.E.2d 291, 297 (1985). Rambus contends that the punitive damage award must be vacated, because, as a matter of law, nominal damages cannot be recovered for fraud under Virginia law.[17]

■ "The usual remedy in an action for fraud is to restore the defrauded party to the position he held prior to the fraud." *Murray v. Hadid*, 238 Va. 722, 385 S.E.2d 898, 904 (1989). In this action, because the Court granted JMOL in favor of Infineon on the infringement claim, and because the Court struck Infineon's evidence of the amount of the attorneys' fees as lacking in the evidentiary predicate of reasonableness, the actual fraud claim was submitted to the jury for a finding of nominal dam-

ages only. The jury returned an award of $1.00 for the actual fraud.

■ It appears that Virginia courts have not directly addressed the issue whether nominal damages can support a claim of fraud. Without direct guidance from Virginia courts, a district court must predict what course the highest court of the state would choose in this instance. *See Byelick v. Vivadelli*, 79 F.Supp.2d 610, 624 (E.D.Va.1999). "The federal court may base its prediction on 'canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions.'" *Id.* (quoting *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir.1999)). Additionally, the court may consider any relevant law review articles and cases from other jurisdictions on the subject. *Id.*

As a threshold matter, it is worth noting that "[t]he standard texts and many cases state flatly that nominal damages are not recoverable and that actual damages are a necessary element of a fraud claim." Dunn, *Recovery of Damages for Fraud*, § 6.1, pg. 254. *See also* Prosser & Keeton, *Torts* § 110 (5th Ed.1984) ("Nominal damages are not awarded in deceit ...").[18] Notwithstanding these general pronouncements, many courts have demonstrated an increasing willingness to allow fraud plaintiffs to recover only nominal damages for fraud. *See e.g. Mercer v. Davis & Berryman Intn'l, Inc.*, 834 F.2d 922, 929 (11th Cir.1987) (applying Alabama law); *Valley Prop. Inc. v. Strahan*, 565 So.2d 571, 581 (Ala.1990); *Greater Coral Springs Realty, Inc. v. Century 21 Real Estate of Florida, Inc.*, 412 So.2d 940, 941 (Fla.App.1982);

---

**17.** Rambus does not dispute that nominal damages can be the basis for punitive damages if nominal damages are properly awarded on a particular claim.

**18.** Prosser & Keeton also state, however, that nominal damages may "be awarded where there is proof that actual damage has occurred, but no proof as to the amount." *Id.* at n. 2.

*Giammanco v. Giammanco,* 253 Ill.App.3d 750, 192 Ill.Dec. 835, 625 N.E.2d 990, 997 (1993), *appeal denied,* 156 Ill.2d 557, 202 Ill.Dec. 921, 638 N.E.2d 1115 (1994); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224 (1984); *Reinah Dev. Corp. v. Kaaterskill Hotel Corp.,* 59 N.Y.2d 482, 465 N.Y.S.2d 910, 452 N.E.2d 1238 (1983); *Beavers v. Lamplighters Realty, Inc.,* 556 P.2d 1328, 1333 (Okla.Ct.App.1976); *Sands v. Forrest,* 290 Pa.Super. 48, 434 A.2d 122, 124 (1981).

The Supreme Court of Virginia has held that:

> [a]n award of *nominal damages* is appropriate where there is a *legal right to be vindicated against an invasion* that has produced no actual, present loss of any kind or where, from the nature of the case, *some injury has been done but the proof fails to show the amount.*

*Town & Country Props., Inc. v. Riggins,* 249 Va. 387, 457 S.E.2d 356, 365 (1995) (emphasis added). *See also Nappe v. Anschelewitz, Barr, Ansell, & Bonello,* 97 N.J. 37, 477 A.2d 1224 (1984) ("The award of nominal damages is made as a judicial declaration that the plaintiff's rights have been violated") (quoting C. McCormick, *Handbook on the Law of Damages* § 20, at 85 (1935)). "Nominal damages are properly awarded when, although the claimant shows significant harm, its amount is not proved with sufficient certainty to entitle him to an award of compensatory damages." Restatement of Torts (Second) § 907, cmt. c.

 Analysis of the issue begins with the recollection that, in order to prove a claim for actual fraud, the complaining party must show damage caused by the fraud. *See Bryant v. Peckinpaugh,* 241 Va. 172, 400 S.E.2d 201, 203 (1991); *Winn v. Aleda Constr. Co.,* 227 Va. 304, 315 S.E.2d 193, 195 (1984). The key inquiry presented by Rambus' argument is: what constitutes "damage" to a fraud plaintiff.

Rambus, relying on *Lloyd v. Smith,* 150 Va. 132, 142 S.E. 363 (1928), *Community Bank v. Wright,* 221 Va. 172, 267 S.E.2d 158 (1980) and *Murray v. Hadid,* 238 Va. 722, 385 S.E.2d 898 (1989), equates the term "damage" to the term "damages" and argues that, absent a showing of compensable, pecuniary damages, the damage element of a fraud claim fails. To support this view, Rambus extracts a few quotes from these decisions and argues that these snibbets of text show that Virginia requires a plaintiff to prove compensatory damages, or "pecuniary loss," in order to recover for fraud. To the contrary, when read in their entirety, the decisions on which Rambus relies stand for the proposition that the plaintiff must sustain an *injury* in order to recover for fraud. The argument pressed by Rambus blurs the distinction between the term "damages" and the term "damage." " 'Damages' means a sum of money awarded to a person injured by the tort of another." Restatement of Torts (Second) § 902. Thus, "[d]amages flow from an injury." *Id.* at § 902 cmt. c. In contrast, "damage" equates with an "injury" which is "the invasion of any legally protected interest of another." *Id.* at § 7. In order to prevail on a claim for fraud, Virginia law requires not a showing of damages (although often the "injury" consists of "damages"), but rather a showing of an injury caused by detrimental reliance on the fraud.

· In *Lloyd,* the Supreme Court of Virginia began with the fundamental observation that "bare allegations of fraud will not of themselves support an action for damages—the facts showing the fraud and the resulting damage must be alleged." *Id.* at 367. However, the Court also made clear that "[n]either fraud nor damage can be presumed, and the allegation of a mere

purpose to commit fraud cannot be made the basis of an action. The purpose must be consummated, *the injury inflicted.*" *Id.* Thus, a fraudulent intent must be accompanied by an injurious act. *Id.*

Rambus, however, focuses only those portions of the opinion which discuss the well-accepted notion that pecuniary damages may support a cause of action for fraud as well. *See id.* ("Fraud without resulting pecuniary damage is not a ground for the exercise of remedial jurisdiction."). The decision, when considered in full, stands for the elemental proposition that fraud must be accompanied by the infliction of an injury and that injury can be manifested in various forms. For example, far from requiring a showing of compensatory damages, *Lloyd* states that "the party asking for [relief from fraud] must have been damaged *or misled to his own hurt.*" *Id.* (emphasis added). Admittedly, the next passage confuses the issue somewhat because the Court quotes an equity treatise for the proposition that "[t]he [defrauded] party must suffer *some pecuniary loss or injury . . .*" *Id.* (emphasis added). That text, however, is within a discussion about materiality of an affirmative misrepresentation and is not really a circumscribing limit on the nature of fraud injury. In the end, *Lloyd* articulates the fundamental precepts: (a) that "*a fraud which causes no injury is not legally cognizable,*" and (b) that, therefore, the complaining party must show "some loss, damage, detriment, *or* injury to him." *Id.* (emphasis added). *See also Wilson v. Carpenter's Adm'r,* 91 Va. 183, 21 S.E. 243, 245 (1895) ("The court does not inquire with any care into the extent of the prejudice. It is sufficient if the party misled has been very slightly prejudiced—if the amount is at all appreciable."). Thus, *Lloyd* teaches that the damage component of a fraud claim requires the demonstration of injury.

Likewise, *Community Bank v. Wright,* 221 Va. 172, 267 S.E.2d 158, (1980) begins with the observation that "[a]n allegation of fraud in the abstract does not give rise to a cause of action; it must be accompanied by allegation and proof of damage." (citing *Lloyd,* 142 S.E. at 367). *Community Bank,* however, goes on to say that "the rule as to what constitutes damage, in any case, may broadly be stated to be that there is no damage where the position of the complaining party is no worse than it would be had the alleged fraud not been committed." *Id.* (quoting *Cooper v. Wesco Bldrs.,* 76 Idaho 278, 281 P.2d 669, 672 (1955)). Thus, if the complaining party can show that he has been put in a worse position, even if that injury is not quantified in terms of dollars, a claim for fraud can be supported.

Rambus next points to *Murray v. Hadid,* 238 Va. 722, 385 S.E.2d 898 (1989) to argue that proof of pecuniary damages must be shown to establish a claim for fraud under Virginia law. It is true, as Rambus states, that *Murray* contains the statement that: "in order to recover under a cause of action for fraud, a plaintiff must prove *damages* which are caused by his detrimental reliance on a defendant's material misrepresentation." *Id.* at 903 (emphasis added). Although that statement seems to require proof of pecuniary damages, the ultimate holding in *Murray* is in no way inconsistent with the idea that "damage" for purposes of fraud means injury. The Court denied recovery in *Murray* because the plaintiffs could not show that they were in a worse position due to the fraud: "In the present action, the Murrays did not actually lose anything as a result of Hadid's fraud. *They are in the same position in which they were prior to the fraud.*" *Id.* at 904 (emphasis added). That certainly does not distill into the rule

that pecuniary damages are the *sine qua non* of a valid fraud claim.

Additionally, in a recent opinion, the Supreme Court of Virginia, while not directly addressing the issue, allowed a finding of actual fraud to stand while vacating, in its entirety, the only award of compensatory damages given by the jury to compensate for the fraud. In *Bershader*, 258 Va. 75, 515 S.E.2d at 300, the Court set aside the award of compensatory damages because the trial court erred in measuring the type of damages available for fraud in that case. Nevertheless, the Court concluded that the plaintiffs had proven by clear and convincing evidence the elements necessary for actual and constructive fraud. *Id.* at 297. Considering that no damages (other than the vacated compensatory damages)[19] were recited as a basis for the fraud findings and that the fraud findings were affirmed, as was equitable relief in the form of a negative easement, it seems rather clear that Virginia law requires that the "damage" element of a fraud claim necessitates proof of an injury which can, but need not, be pecuniary "damages."

Here, Infineon certainly is not in the same position as it was before the fraud. Because Rambus violated JEDEC's disclosure policy, the JEDEC committee adopted a standard which potentially infringed Rambus' patents. Infineon designed new products that complied with the JEDEC standard, built new manufacturing facilities and began to manufacture those products. Thus, when Rambus asserted its patents against Infineon, Infineon was in a worse position than it would

have been had there been no fraud. If Rambus had disclosed its patents, the JEDEC standard may have been different, Infineon could have designed around Rambus' asserted patent rights or Infineon might have been able to negotiate a reasonable royalty while it was not under the leverage of having to protect a vast investment in new products and a new plant (a factor which severely hampers any free negotiation). Instead, because Rambus remained silent, Infineon was put to the choice of knuckling under to the exceedingly high royalty rates being demanded by Rambus or defending itself against the patent infringement suit. Infineon understandably chose to defend its JEDEC compliant products against charges of infringement. Therefore, it is in a materially different position than it would have been if it were not for the fraud committed by Rambus. As a result, it paid attorneys' fees to Slater & Matsil to analyze the issues of infringement and to help outline a defense in perspective of that analysis. This is an injury, as to which this proof fails to show the amount, but it is an injury and may be addressed with an award of nominal damages. *See Town & Country Props., Inc. v. Riggins*, 249 Va. 387, 457 S.E.2d 356, 365 (1995); Prosser & Keeton, *Torts*, § 110 n. 2 (5th ed 1984).[20]

Finally, there are strong policy reasons for allowing an award of nominal damages to constitute proof of injury in support of a claim for actual fraud, which, of course, is an intentional tort. In the well-reasoned opinion of *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 477 A.2d

---

19. The Supreme Court of Virginia sustained an award of attorneys' fees but, as Rambus argues elsewhere in its JMOL motion and as this Court has found, that award was not a component of the fraud injury claimed by the plaintiff; it was a prevailing party award.

20. Moreover, as explained in a separate opinion, the risk of future litigation (with the attendant enormous expense) is another consequence of the fraud so substantial that Infineon is entitled to an injunction to protect against further infringement suits by Rambus. The fraud also produced that inquiry which warrants the equitable relief of injunction.

1224 (1984), the Supreme Court of New Jersey cogently explains the ancestry of the tort of fraud and why it is appropriate to allow nominal damages to support this claim. The *Nappe* court observed that "whether [actual] damage is essential to the existence of a cause of action for a particular tort may depend very largely upon its ancestry in terms of old procedure." *Id.* at 1229 (citing W. Prosser, *Handbook on the Law of Torts* § 7, at 30) (4th Ed.1971). In *Nappe,* the court gives a detailed historical background of the difference between common law writs of trespass and trespass on the case. Trespass "was considered quasi-criminal in nature and was the remedy for forcible, direct, and immediate injuries to persons or property." *Id.* at 1228. The plaintiff was not required to prove actual damage "because invasion of the plaintiff's rights was regarded as the tort in itself." *Id.* at 1228–29 (citing Prosser, at § 7 pg. 29).

Conversely, trespass on the case developed as a supplemental remedy to allow a plaintiff recover for injuries occurring indirectly:

> The classic illustration of the difference involves that of a log thrown onto a highway. If a person were struck by the log, trespass would lie. If he fell over the log as it lay on the road, the action would be on the case.

*Id.* at 1229. Trespass on the case actions normally required proof of actual damages. *Id.*

While the differences between the two forms of action have largely been eroded, a distinction has remained as to the requirement of damages. *Id.* There are "case" actions which still require proof of actual damages, such as slander of title, disparagement of goods, and slander that is not *per se;* however, other "case" actions have abandoned the common law distinction and allow recovery even in the absence of proof of compensatory damages, such as libel, slander *per se,* nuisance and malicious prosecution. *Id.* (citing C. McCormick, *Handbook on the Law of Damages* § 22, at 89 (1935)).

Having reviewed the rather arbitrary underpinnings of the requirements of common law, the New Jersey Supreme Court chose to modify the common law rules because they were no longer "fair and equitable," *id.:*

> Although distinctions based on common-law writs may once have been appropriate, the requirement of actual damage to sustain a cause of action for intentional torts no longer serves a useful purpose, at least where a victim of an intentional wrong has suffered some loss, detriment, or injury but is unable to prove that he is entitled to compensatory damages. *His rights have been invaded and he should be entitled to vindication in an award of nominal damages. Indeed, it is difficult to justify permitting nominal damages in a trespass action and not in a case of a wilful and malicious intentional tort.* We hold, therefore, that compensatory damages are not an essential element of an intentional tort committed wilfully and without justification *when there is some loss, detriment or injury,* and that nominal damages may be awarded in such cases in the absence of compensatory damages.

*Id.* at 1229–30 (emphasis added and footnotes omitted).

As to the award of nominal damages for fraud, the *Nappe* court explained that, in addition to proving damage, the plaintiff must demonstrate scienter—that is "knowledge of the falsity of the representation with the intent that the other party rely thereon." *Id.* at 1232. "Such fraudulent conduct constitutes unfair dealing whether or not actual damages are shown." *Id.* Similarly, the *Nappe* court

noted that nominal damages are particularly appropriate for intentional torts because they allow exemplary damages to be recovered. *Id.* ("If no compensable harm is done even though the defendant's conduct is very wrongful, the normal admonitory function of tort law is not brought into play unless exemplary damages are assessed.") (quoting Note, "Exemplary Damages in the Law of Torts," 70 *Harv.L.Rev.*, 517, 529 (1957)).

The court in *Nappe*, thus, joined the courts of other states that "have refused to be constrained by the outmoded common-law requirement [of actual damages] and have sustained actions for legal fraud when the plaintiff's injury was not compensable." *Id.* at 1232–33 (collecting cases). Furthermore, some courts allow punitive damages to be awarded in fraud actions when there is a showing of injury, even without an award of compensatory damages. *Id.* at 1233 (collecting cases).

The *Nappe* court ultimately concluded that "[e]ven if the person relying on the falsehood were unable to establish actual damages, he should be entitled to vindicate his rights through an award of nominal damages and in appropriate cases to punish the defendant through an award of punitive damages." *Id.* at 1232. *Accord Commonwealth of Ky. Dep't of Agric. v. Vinson*, 30 S.W.3d 162, 166 (Ky.2000) ("compensatory damages are not an essential element of an intentional tort committed wilfully and without justification. The mere fact that no compensatory damages were awarded to [the plaintiffs] does not mean that they did not have compensable injuries."). *But see Olson v. Fraase*, 421 N.W.2d 820, 827 (N.D.1988) (disagreeing with *Nappe* and holding that nominal damages cannot be recovered for fraud be-

cause fraud requires a showing of damages).

Here, the jury's verdict leaves no doubt that Rambus committed intentional fraud, with the goal of inducing the JEDEC committee to create a standard which used Rambus' patented technology so that Rambus could claim a royalty on the sales of products made to the specifications of the standard. Rambus also intended to sue to enforce these patents, believing that the cost of litigation and the risk-of-loss factor would pressure manufacturers into accepting licenses.[21] Infineon has suffered an injury as a result of that fraud, namely that it has been forced to litigate the patent infringement suit after having expended considerable funds to create its products and manufacturing lines. The injury has been proven, though the precise amount has not. Nominal damages are appropriate here, and they are sufficient to constitute an injury and to support punitive damages.

Thus, the motion for JMOL on the award of punitive damages in Count 10 is denied.

### F. The Statute of Limitations

Rambus next argues that JMOL should be granted because the jury erroneously concluded that Infineon's claims were not barred by the statute of limitations. Section 8.01–249(1) provides that a cause of action accrues:

> [i]n actions for fraud or mistake and in actions for rescission of contract for undue influence, when such fraud, mistake, or undue influence is discovered or *by the exercise of due diligence reasonably should have been discovered . . .*

---

**21.** The evidence at trial showed that several manufacturers (representing about 40% of the

market) opted for that course.

(emphasis added). An action for fraud must be brought within two years from the accrual of the cause of action. Va.Code § 8.01–243.

In this action, Infineon filed its fraud claim in January 2001. Therefore, in order to establish that Infineon's claim is barred by the statute of limitations, Rambus must prove, by the preponderance of the evidence, that Infineon was on inquiry notice of its fraud claim as of January 1999. Rambus argues that Infineon was on inquiry notice at least as late as 1997 as to whether it had a claim against Rambus for violating a JEDEC related duty. Rambus relies, in large part, on the same evidence presented to support its claim that Infineon's reliance on the omissions at the JEDEC meetings was not reasonable.

The jury found that Rambus had not proved, by a preponderance of the evidence, that Infineon had reason to know of, or should have discovered, Rambus' violations of the JEDEC disclosure policy or of Rambus' efforts to draft claims covering JEDEC's standardization work. Viewing the evidence in the light most favorable to Infineon, the non-movant, the evidence shows that, although Infineon expressed concerns about the scope of Rambus' patent rights, the deliberate silence of Rambus at JEDEC committee meetings and its disclosure of the '703 patent (a RDRAM patent) led Infineon to believe that Rambus' technology did not cover JEDEC's SDRAM standard. Furthermore, although Rambus repeatedly points to its withdrawal letter from JEDEC as proof of inquiry notice, there was no evidence presented at trial indicating that Infineon ever saw that letter or that Infineon should have known that Rambus' patents related to SDRAMs. In fact, the evidence showed that Infineon had seen neither the letter nor the list of patents until after this action started.

Rambus had the burden to prove, by a preponderance of the evidence, that, before January 1999, Infineon knew or should have known of the facts giving rise to its fraud claim. Rambus failed to do so. The evidence presented at trial permitted the jury reasonably to conclude (as it did) that Infineon did not know of the fraud, nor should it have suspected the fraud, before Rambus asserted its patents against Infineon in the summer of 2000. Hence, the motion for JMOL on that ground is denied.

### G. Jury Instruction on *Kingsdown*

"There is no dispute among the circuits, nor in [Federal Circuit] jurisprudence, that a judgment should be altered 'because of a mistake in jury instructions only if the error was prejudicial' and that we must 'look to the entire jury charge ... to determine whether the instructions fairly stated the legal principles to be applied by the jury.'" *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 853 (Fed.Cir.1991) (collecting circuit court cases, including *Wellington v. Daniels*, 717 F.2d 932, 938 (4th Cir.1983)). "'District courts are necessarily vested with a great deal of discretion in constructing the specific form and content of jury instructions,' and they are not required to 'accept all the suggested instructions offered by the parties.'" *Emergency One, Inc. v. American FireEagle, Ltd.*, 228 F.3d 531, 538 (4th Cir.2000) (quoting *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1293–94 (4th Cir.1995)). "So long as the charge is accurate on the law and does not confuse or mislead the jury, it is not erroneous." *Id.* (quoting *Hardin*, 50 F.3d at 1294). When a party alleges that jury instructions are incorrect because the court failed to give a requested instruction, the complaining party faces "a two-fold task": it "must both prove the jury instructions read in their entirety

were incorrect or incomplete as given and then demonstrate that the suggested instruction could have cured the error." *Biodex,* 946 F.2d at 853.

■■■■ Rambus charges that the Court erred by failing to give its requested jury instruction based on *Kingsdown Medical Consultants, Ltd. v. Hollister,* 863 F.2d 867 (Fed.Cir.1988). The proposed instruction stated:

> It is not improper to amend or add patent claims intended to cover a competitor's product about which the applicant has learned during the prosecution of the patent application, including a continuation or divisional patent application, provided that the claims are supported by the original patent application.

The Court, however, determined that the proffered instruction was a misstatement of the law as applied to the facts of this case and would mislead the jury. The Court agreed to give Rambus' proffered instruction, with the following additional limitation: "provided that the added or amended claims are not based on information obtained by engaging in wrongful conduct." Rambus rejected this instruction allegedly because it believed that the language would have rendered the instruction incorrect and confusing to the jury.

Rambus contends that the failure to give its proposed instruction constituted preju-dicial error because the *Kingsdown* instruction would have eviscerated Infineon's fraud claim. Contrary to Infineon's theory at trial, Rambus asserts that *Kingsdown* allows Rambus to add claims that would render other JEDEC participants patent infringers. *See Kingsdown,* 863 F.2d at 874 ("there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitors product the applicant's attorney has learned about during the prosecution of a patent application.").

Infineon responds that the jury instruction was correctly rejected because the instruction could have, and likely would have, misled the jury to infer that, under the patent laws, it is acceptable for a member of a standard-setting body to breach its duty of its disclosure.[22] Thus, because the instruction was not tailored to the facts of this specific case, Infineon argues that rejection of the instruction, as proposed by Rambus, was appropriate. *See Duke v. Uniroyal Inc.,* 928 F.2d 1413, 1421 (4th Cir.1991) ("Abstract propositions of law stated to the jury without regard to the factual circumstances are potentially confusing.").

---

**22.** Of course, that is not the law. *See Wang Lab., Inc. v. Mitsubishi Elec.,* 103 F.3d 1571, 1582 (Fed.Cir.1997) (affirming a finding of an implied license based on equitable estoppel because, when the patent holder was a member of JEDEC, "the entire course of conduct" between the parties led Mitsubishi "to infer consent to manufacture and sell the patented products."); *Stambler v. Diebold, Inc.,* 11 U.S.P.Q.2d, 1709, 1714–15 (E.D.N.Y.1988) (holding that a patent holder who believed that a certain technology infringed his patents, but did not tell the standard-setting body of which it was a member that his patent applied to the technology under consider-ation, was equitable estopped from asserting his patent because of his misleading silence), *aff'd* 1989 WL 50518, 878 F.2d 1445 (Fed.Cir.1989); *Potter Instr. Co. v. Storage Tech. Corp.,* 207 U.S.P.Q. 763, 769 (E.D.Va.1980) (holding that patent holder was estopped from asserting its patent when it participated in a standards-setting organization and failed to inform the organization of its relevant patent, in contravention of that group's policy), *aff'd on laches ground,* 641 F.2d 190 (4th Cir.1981).

These decisions further underscore the error in the *Kingsdown* instruction proposed by Rambus.

The first task is to decide whether the failure to give the *Kingsdown* instruction was error. It was not. *Kingsdown* was concerned with the unenforceability of a patent based on inequitable conduct before the PTO. The Federal Circuit held that the mere act of filing patents to cover a competitor's product was not improper conduct and therefore could not be a basis for finding inequitable behavior before the PTO.

Here, the issue before the jury was not whether Rambus behaved inequitably before the PTO by obtaining additional patent claims, but instead whether Rambus committed fraud under Virginia law by failing to disclose its pending patent applications to a standard-setting body, notwithstanding the obligation to do so. The instruction offered by Rambus would have been confusing to the jury because it gives the impression (as Rambus, no doubt, desired), that, simply because it is permissible under the patent laws to obtain patents to cover a competitor's product, that it is likewise permissible to commit fraud that facilitates the obtaining of such a patent. Rambus cited no decision, at trial or even now, indicating that the *Kingsdown* rule could be distorted in such a fashion.

Moreover, the distinction offered in the Court's proffered version of the instruction is analogous to the exception mentioned in *Kingsdown:* "[a]ny such amendment or insertion must comply with all statutes and regulations." *Kingsdown,* 863 F.2d at 874. That text teaches that the instruction permitted by *Kingsdown* cannot be based on information obtained by engaging in wrongful conduct because that conduct is in violation of the law of fraud.

■ Because the instruction was not in error, the motion for JMOL will be denied. Even assuming, *arguendo,* that it was error, JMOL is still inappropriate. Rambus argues that, because a properly instructed jury could not have returned a verdict of fraud based on the evidence, JMOL in its favor is required. *See Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560 (Fed.Cir.1985) (concluding that the court erred in instructing the jury, thus making a grant of a new trial appropriate; however the appellant requested JNOV, therefore the court would consider the evidence under the proper legal standard). Infineon responds that Rambus' claim of prejudice is pure speculation.

Viewing the evidence through the legal standard of *Kingsdown,* JMOL would still be inappropriate because the propriety of filing amendments under the patent laws is a separate inquiry from the fraud claim. Even though Rambus is allowed, at some general level, to draft claims to cover a competitor's product, it cannot do so when that action would breach a duty it incurred as result of being a member of a standard-setting body. The breach of that duty was based on a failure to disclose pending patent applications, not on Rambus choice to amend its patents. Therefore, the proffered instruction, if given to the jury, would not have affected the finding of fraud.

## III. DISCUSSION: MOTION FOR NEW TRIAL

Rambus has moved also for a new trial under Fed.R.Civ.P. 59(a) asserting as the grounds for that motion virtually the same theories advanced in support of its motion for JMOL.

### A. Standard for Motion for a New Trial

Pursuant to Rule 50(c),

[i]f the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it

should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for denying the motion for the new trial.

Fed.R.Civ.P. 50(c)(1). Rule 59(a), in turn, provides that a motion for new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law."

 "There is a significant difference between deciding a motion for [JMOL] and deciding a motion for a new trial. The trial court is prohibited from assessing the credibility of witnesses and weighing the evidence when ruling on a motion for [JMOL]. In contrast, the trial court can weigh evidence and assess credibility in deciding whether to grant a new trial." *Whalen v. Roanoke Co. Bd. of Supervisors,* 769 F.2d 221, 226 (4th Cir.1985). *See also* 9 *Moore's Federal Practice,* § 50.08[2] (3d. ed.1998) (same). "Judgment as a matter of law may be granted only when no reasonable jury could find for the nonmovant, but a motion for new trial may be granted as long as the judge has the firm conviction that the verdict is incorrect." *Id.* The Fourth Circuit has explained that, under Rule 59:

> A new trial will be granted if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998) (internal citations omitted). *See also Wyatt v. Interstate & Ocean Transp. Co.,* 623 F.2d 888, 891–92 (4th Cir.1980).

### B. Motion For New Trial

To the extent that the new trial is sought on grounds that have been rejected in denying the motion for JMOL, the motion for new trial is denied for the reasons given in denying the motion for JMOL. Moreover, after assessing the credibility of the witnesses and weighing the evidence, the Court is of the opinion that the verdict imposing liability, nominal damages and punitive damages for the actual fraud claim is certainly supported by the clear weight of the evidence and is not based on evidence that is false. Indeed, a weighing of the evidence and assessment of the credibility of the witnesses leads the Court to firm conviction that the jury rightly, and on clear and convincing evidence, decided the actual fraud claim as it concerned the conduct of Rambus in the JEDEC SDRAM standard-setting process. The evidence clearly and convincingly showed the existence of a disclosure duty that was intentionally violated by Rambus with the goal that Infineon, indeed all JEDEC members, would rely on its silence in constructing an SDRAM standard, with the result that products made in compliance with it would infringe Rambus' products. The evidence showed clearly and convincingly that Infineon reasonably relied on Rambus' silence and representations in deciding to vote for the JEDEC SDRAM standard and in designing and manufacturing and marketing its JEDEC-compliant SDRAM products. As explained previously, Infineon was undoubtedly injured by the fraud.

Further, the evidence clearly and convincingly showed that Rambus committed actual fraud wantonly and maliciously and in total disregard of the rights of Infineon and all other JEDEC members by coupling its deliberate, pervasive, long-term violation of JEDEC's disclosure policy with its implemented strategy to take advantage of its fraud by constantly using information (made known to it only because it was a JEDEC member) to modify its patent applications to assert claims

which Rambus intended to cover the technology of the JEDEC standard. And, it did all that so that it could exact inordinately high royalty rates from the manufacturers who were, for the most part, the very JEDEC members who were offended by the fraud of non-disclosure. Punitive damages are entirely appropriate to sanction conduct of that sort. Thus, there is no miscarriage of justice by allowing the thoroughly grounded actual fraud verdict to stand and, indeed, to be implemented to the full extent permitted by law.

Nor does the Court harbor any apprehension about the validity of the jury's verdict on the statute of limitations. It is fully supported by the evidence.

Lastly, because the Rambus' proffered jury instruction based upon *Kingsdown Medical*, 863 F.2d 867, was properly rejected and, alternatively, because Rambus suffered no prejudice from the failure to instruct the jury pursuant to *Kingsdown Medical*, the motion for a new trial on that ground is likewise denied.

Although the motion for JMOL was granted on the constructive fraud claim (Count 11), the motion for new trial is nonetheless denied as to that count because the grant of JMOL was predicated on a purely legal question. If the JMOL

is reversed because of error in the decision that, as a matter of law, a negligent non-disclosure cannot constitute fraudulent concealment under Virginia law, there is no need for a new trial because the evidence otherwise fully supports a verdict of constructive fraud.[23]

As to the motion for new trial on the actual fraud verdict (Count 10) respecting Rambus' conduct in connection with the DDR SDRAM standard-setting process, a new trial is in order if the grant of JMOL on that issue is reversed. The evidence, as recited previously, leaves the Court the "firm conviction that the jury verdict was incorrect" and that the verdict was against the clear weight of the evidence. The weight of the evidence demonstrates that Infineon failed to prove that Rambus had a duty to disclose pending patents relating to DDR SDRAM because Rambus was not a member of JEDEC at the relevant time in which the DDR SDRAM standard was under consideration.

Thus, in the event that the grant of JMOL on the DDR SDRAM standard is adjudged to be in error, a new trial should be held as to actual fraud in respect of the JEDEC to the DDR SDRAM standard-setting.[24] Because Rambus has prevailed on its challenge to the duty, it is not necessary to consider Rambus' remaining

**23.** The constructive fraud claim would have to be set aside, as a matter of law, for the additional reason that constructive fraud, under Virginia law, does not require proof that the fraud was committed wantonly or maliciously which, as explained in Section II.C.6.c, is the predicate for recovery of attorneys' fees as damages under Virginia law. If that legal conclusion is incorrect, then there still is no warrant for a new trial.

**24.** Although the jury verdict form asked the jury to specify whether its fraud finding related to the SDRAM or DDR SDRAM technology or both, the damage awards were not separated by technology. Nevertheless, Rambus has agreed that, if the DDR SDRAM fraud verdict

were set aside, it would not be necessary to conduct a new trial on damages because the finding of liability on the SDRAM technology alone would support the $1.00 in nominal damages for actual fraud and $3,500,000.00 in punitive damages. Rambus acknowledges that Infineon's proof at trial did not distinguish between the two technologies for purposes of establishing damages.

Furthermore, Rambus does *not* ask the Court for a new trial on the issue of fraud as to the SDRAM standard merely as a consequence of a grant of JMOL on the DDR SDRAM standard, however, Rambus has not waived its other grounds for the motion for a new trial.

challenges to the fraud finding on the DDR SDRAM.

## CONCLUSION

For the reasons set forth above, Rambus' motion for judgment as a matter of law is granted in part and denied in part as explained in the foregoing opinion.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.